Harold STEVENSON, Plaintiff,

v.

The **BOARD OF REGENTS OF** the **UNI-VERSITY OF TEXAS** et al.,
Defendants.

Civ. A. No. A–73–CA–24.

United States District Court,
W. D. Texas,
Austin Division.

April 15, 1975.

Sam Houston Clinton, Jr., Clinton & Richards, Austin, Tex., for plaintiff.

William C. Bednar, Jr., Austin, Tex., for defendants.

HAND,* District Judge.

This cause coming on for trial before the Court on the 17th day of February, 1975 and the Court having heard the evidence and the witnesses and having considered the law applicable, finds as follows:

### FINDINGS OF FACT

1. This is an action predicated upon Title 42, U.S.C., § 1983 and § 1985 in which the plaintiff, Harold Stevenson, a former graduate student at the University of Texas at Austin, contends he was unlawfully discontinued from a doctoral degree program in the Department of Physical and Health Education of the University. Defendants are The Board of Regents and Chancellor of the University of Texas System, the President of the University of Texas at Austin, the Dean of the Graduate School, the Chairman of the Department of Physical and Health Education, and the individual members of the Committee on Graduate Studies of that department.

2. The plaintiff received a M.Ed. degree in physical and health education from the University of North Carolina in May, 1951. From 1954 to 1963, the plaintiff took several summer graduate courses in physical education at the University of Texas at Austin. In the fall of 1965, plaintiff was hired as a teaching assistant in physical education at the University of Texas at Austin and pursued his studies toward a doctoral degree each semester through the summer, 1967.

3. In May, 1967 the plaintiff took, but did not pass, a qualifying examination for doctoral candidacy administered by the Committee on Graduate Studies of the College of Education. In the fall of 1970 plaintiff again began taking course work pursuant to a doctoral degree in physical education at the University of Texas at Austin. At all material times, plaintiff's graduate advisor was Dr. Lynn W. McCraw, Professor of Health, Physical Education and Recreation, University of Texas at Austin.

4. In January, 1971, plaintiff applied to the Graduate Studies Committee of the Department of Physical and Health

* Sitting by designation.

Education to take a qualifying examination for doctoral candidacy. Dr. Mc-Craw, as a proposed supervising professor, counter-signed plaintiff's application to take the examination, the effect of which was to certify that the plaintiff had completed course prerequisite and was ready for the examination.

5. During the period 1965–67, the plaintiff began promoting and selling for profit, as a means of earning personal income, an exercise apparatus bearing the trade name "Exer-Genie". In the spring of 1967, prior to the first qualifying examination taken, and not passed by the plaintiff, plaintiff received approval from Dr. McCraw to collect data for a proposed dissertation project entitled "Comparison of Isometric-Isotonic and Combined Isometric-Isotonic Exercise in the Development of Cardiovascular Efficiency, Muscular Strength and Endurance, Flexibility and Muscular Hypertrophy", which was to involve a comparison of the results achieved by use of the "Exer-Genie" apparatus with those achieved by bar bell and isometric and physical conditioning program. It was expressly understood between plaintiff and Dr. McCraw that the data collected in such study would not be used as a project for a dissertation without the approval of the plaintiff's supervising committee, if and when such a committee was appointed upon his admission to doctoral candidacy.

6. As part of the promotion and selling of the "Exer-Genie", plaintiff made representations in televised commercial advertisements and other advertising media concerning the results of exercise with the device, specifically that performance of a specified series of exercises with the device would develop cardio-vascular efficiency by increasing the pulse rate in an amount roughly commensurate with that achieved by running a 220 yard dash, which many of the graduate faculty in the Department of Physical and Health Education, including Dr. McCraw, believed were unsubstantiated by valid research evidence.

7. In a counseling session during January, 1971, Dr. McCraw advised the plaintiff that he and other faculty members were disturbed by the public representations plaintiff had made concerning the "Exer-Genie" and that plaintiff could expect some questions from the examining team concerning these representations at his oral examination, that their questions would likely be more rigorous than they would be if they had had him in class, and that plaintiff would be downgraded by the examining team for lack of knowledge of the value of exercise on the cardio-vascular system if, at the oral examination, he attempted to defend the representations he had made concerning the "Exer-Genie".

8. The examination to enter candidacy for the doctoral degree program included the following: (1) a written qualifying examination; (2) consideration of the applicant's past academic record including the GPA, depth of study in a primary area of research, and the pattern and recency in which courses are taken throughout the course of the applicant's study; (3) the applicant must submit a scholarly paper not less than 20 pages in length; and (4) the applicant must take and pass an oral qualifying examination. The above four requirements are graded on a scale from one to five, with five being the highest available grade in each respective category of the entrance exam. The plaintiff's scores are as follows: (1) written qualifying examination—2.71; (2) applicant's academic record—2.83; (3) scholarly paper—1.33; and (4) oral qualifying examination—1.71.

9. The following standard procedures of the Department of Physical and Health Education for doctoral qualifying examination were in effect at the time of plaintiff's application and were followed in the plaintiff's case:

(a) Before a student may be admitted to candidacy for a doctoral degree he must complete required course work and pass a qualifying examination administered by the graduate studies committee

of the Department of Physical and Health Education.

(b) The Graduate Studies Committee of the Department of Physical and Health Education is composed of all full members and associate members of the graduate faculty in the Department.

(c) In determining whether to admit or deny an applicant to doctoral candidacy the Graduate Studies Committee considers four separate factors:

(1) The academic record of the applicant in terms of grade point average, depth of study in a primary area of research and the pattern and recency in which the courses have been taken throughout the course of the applicant's study;

(2) A scholarly paper of approximately 20 pages on a topic selected by the applicant and approved by the Graduate Faculty in Physical and Health Education;

(3) The applicant's written response to a written qualifying examination consisting of one or more questions propounded by a subcommittee of the Graduate Studies Committee; and

(4) The applicant's response to an oral qualifying examination consisting of questions propounded by an examining team composed of members of the Graduate Studies Committee.

(d) If an applicant is adjudged deficient in any one of the four factors considered by the Committee, this deficiency alone can serve as a basis for denying the applicant admission to candidacy.

(e) Prior to taking the oral examination, an applicant must have taken the written qualifying examination and submit his academic record and a scholarly paper to the Committee.

(f) The Oral examination is conducted by an examining team composed of at least five members of the Graduate Studies Committee.

(g) Prior to the oral examination, each member of the examining team considers the applicant's academic record, scholarly paper, and written examination response.

(h) Following the oral examination, which may consist of any questions an examining team member may feel are pertinent to the applicant's doctoral candidacy, each member of the examining team fills out a written evaluation form consisting of the following items:

(1) A rating of the applicant's performance under each of the four factors considered (academic record, scholarly papers, written examination and oral examination) on an ordinal scale of 1 (lowest) to 5 (highest); and

(2) The recommendation of the examining team member as to whether the applicant shall be (a) admitted to candidacy, (b) denied admission to candidacy but permitted to continue doctoral studies; or (c) discontinued in a doctoral program.

(i) These completed evaluation forms are then turned into a secretary who prepares a summary sheet containing averages of the gradings given in each of the four categories or factors and a count of the number of examining team members who made recommendations to admit to candidacy, to deny admission but permit continuance of study and to discontinue from study.

(j) The Graduate Studies Committee then meets as a whole and utilizes the summary sheet as a starting point for a discussion of the qualifications of the applicant, which includes an opportunity for each examining team member to explain, defend or modify his or her ratings and recommendations.

(k) After discussion, motions are made and voted upon, and the Committee takes action, in accordance with the following procedure:

(1) If a motion is made to admit the applicant to candidacy, and it passes, the Committee forwards a recommendation to that effect to the Graduate Dean of the College of Education, and no further motions are necessary.

(2) If a motion to deny admission to candidacy but permit continuance of doctoral study is made, and passes, it may be followed by other motions prescribing the conditions under which the applicant is to continue study, which may include the time that must elapse or the courses that must be completed before the applicant may repeat the qualifying examination, and the Committee then makes an appropriate report to the Associate Dean for Graduate Studies in the College of Education.

(3) If a motion to discontinue the applicant from doctoral studies is made, and passes, a report to that effect is forwarded to the Associate Dean for Graduate Studies in the College of Education, and no further motions are necessary.

(4) There is no set procedure as to the order of the subject matter of these motions.

(l) Although a recommendation of the Committee to admit an applicant to candidacy is reviewable by the Graduate Dean of the College of Education without further action by the applicant, decisions of the Committee to deny admission to candidacy but permit continuance of doctoral study or to discontinue from doctoral study are final decisions that are not reviewable by the Graduate Dean except upon formal petition by the applicant.

(m) An applicant who is dissatisfied with a decision by the Committee may obtain review of the decision either by (a) submitting a formal request for reconsideration to the Chairman of the Committee on Graduate Studies or (b) submitting a petition for review directly to the Graduate Dean of the College of Education.

10. Prior to the oral examination, and in satisfaction of the requirement for a scholarly paper, plaintiff submitted to the Graduate Studies Committee a master's thesis he had completed prior to receiving his master's degree in 1961, and copies thereof were distributed to the members of the Graduate Studies Committee, along with copies of plaintiff's academic records.

11. On February 17, 1971, plaintiff appeared for oral examination before an examining team composed of the following members: Dr. Jessie Helen Haag; Dr. Lynn McCraw; Dr. Mary B. Alderson; Dr. Dorothy Burdeshaw; Dr. Waneen Wyrick; Dr. William Chasey; and Dr. Jack Daniels. Following the oral examination each examining team member filled out and submitted for summarization an evaluation form with respect to the plaintiff in accordance with the procedures described hereinabove at 9(h) and 9(i).

12. On February 19th and 22nd, the Committee on Graduate Studies met to consider and vote upon the doctoral candidacy of plaintiff and four other candidates. After a full discussion of plaintiff's doctoral candidacy by the Committee, including but not limited to the numerical ratings awarded to plaintiff in each of the four categories, a motion was made and duly seconded to discontinue plaintiff from the doctoral studies program, and the motion passed with seven members voting for it, none voting against it and one member abstaining.

13. It has been stipulated by and between the parties that a shortcoming of a prospective doctoral candidate in respect to any one of the four factors evaluated by the examining team and discussed and voted upon by the Graduate Studies Committee is, in and of itself, a sufficient basis in fact for a reasonable committee member to vote not to continue the candidate in the doctoral studies program.

14. By letter dated February 24, 1971, Dr. Jessie Helen Haag, Chairman of the Committee, notified plaintiff that the Committee had voted to discontinue him from the doctoral studies program. By letter dated March 9, 1971, plaintiff requested Dr. Gordon W. Whaley, Dean of the Graduate School, to review his case. On or about April 16, 1971, Dean Whaley referred the plaintiff's case to

the Graduate Council, which in turn recommended that the case be transmitted to the Graduate Studies Committee in Physical and Health Education, together with a request for a full explanation of the situation from the Graduate Studies Committee.

15. Pursuant to the request of Dean Whaley, Drs. Haag and McCraw submitted letters to Dean Whaley in explanation of the action taken in their Committee. Dean Whaley submitted the matter to the Graduate Council for further consideration and, as suggested by the Graduate Council, appointed Drs. A. R. Schrank, Karl Klein, Lester Harrell and Thomas M. Runge as a review committee to review the record of plaintiff's case.

16. On August 23, 1971, the reviewing committee appointed by Dean Whaley met, reviewed the plaintiff's record and affirmed the decision of the Graduate Studies Committee. By letter dated September 1, 1971, Dean Whaley granted plaintiff's request to present his case personally before the Graduate Council, and plaintiff was afforded a twenty minute hearing before the Council on November 30, 1971.

17. At the hearing on November 30, 1971 plaintiff presented to the Graduate Council his version of the facts pertinent to his case and explanatory statements akin thereto. The Graduate Council subsequently advised Dean Whaley that a conference ought to be held with the Chairman of the Committee and Dr. McCraw, to raise the issue of the plaintiff's discontinuance on other than purely academic grounds and to ask the Committee for a further statement, which Dean Whaley did. After a report was submitted to Dean Whaley on February 3, 1972 by Dr. Waneen Wyrick, then Chairman of the Graduate Studies Committee, Dean Whaley notified the plaintiff by letter dated February 4, 1972, that he supported the recommendation of the Committee that his petition for reconsideration be rejected, and declared the case closed. Plaintiff's fur-

ther appeals to the President, University of Texas at Austin, and to the Vice Chancellor for Academic Affairs, University of Texas System, were rejected.

## CONCLUSIONS OF LAW

■ 1. The essence of plaintiff's claim is that the Committee on Graduate Studies failed him on a qualifying examination and discontinued him from further doctoral studies because of their dissatisfaction with his activities in promoting for sale an exercise apparatus called the "Exer-Genie". Plaintiff urges that members of the Committee were prejudiced with respect to him as he sat for his oral examination, thus the Committee's action was in bad faith, arbitrary, and capricious. Plaintiff cites Connelly v. University of Vermont and State Agricultural College, 244 F.Supp. 156 (D.Vt.1965). In *Connelly*, supra, the Court recognized that, while the purely academic question of "whether the plaintiff should or should not have received a passing grade * * * a matter wholly within the jurisdiction of the school authorities, * * * to the extent that plaintiff had alleged his dismissal was for reasons other than the quality of his (academic) work, or in bad faith, he has stated a cause of action." However, the remedy in *Connelly*, supra, was that the student was entitled to have his academic performance reevaluated at a fair and impartial hearing before an appropriate department or committee of the institution. The evidence is uncontradicted that on November 30, 1971 plaintiff was permitted to appear before the Graduate Council which was tantamount to a due process hearing.

■ 2. The Court is of the opinion that the plaintiff's performance on the qualifying examination was in the first instance fairly judged by the Committee on Graduate Studies. Further, the plaintiff was afforded an opportunity to be heard on the decision rendered by the Committee on Graduate Studies in that he was afforded a hearing in which he

had ample opportunity to demonstrate that the consideration given him on the examination was less than fair and impartial. The conclusions of this Committee to which plaintiff was permitted to appeal go in support of the Committee on Graduate Studies' findings that plaintiff did not, in fact, qualify to continue in the doctoral program.

■ 3. Plaintiff alleges that as positive evidence of ill will or bad faith on the part of the members of the Committee on Graduate Studies, said members questioned him regarding the claims made by him in his advertisements of the "Exer-Genie"—assertions that it improved cardio-vascular efficiency. This Court is of the opinion that plaintiff, as a doctoral candidate for a degree in physical and health education, ought, most ably, to be able to respond to this form of question. However, the testimony of the witnesses, members on the Committee, affirmatively disclosed that no questions regarding the "Exer-Genie" were asked at plaintiff's oral examination, or, if there were, the witnesses were unable to recall the gravity or degree of such questions, hence, this Court is of the opinion that plaintiff was not asked to defend any advertising claims that he had asserted on behalf of the "Exer-Genie".

■ 4. The Court is further of the opinion that any inquiries directed toward the "Exer-Genie", if any, would not, per se, be evidence of any bias or prejudice on the part of the persons who propounded them, much less on the part of the eight members of the Committee on Graduate Studies who, with one member abstaining, ultimately voted to discontinue him from further study.

■ 5. Plaintiff also urges that this Court find that plaintiff's activities in advertising the "Exer-Genie" were considered by the Committee when the decision was rendered to dismiss him from the Graduate Program, hence, such a dismissal infringed upon rights guaranteed by the First and Fourteenth Amendments of the Constitution of the United States. Plaintiff relies on Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) which held that even a person with no right to a governmental benefit may not be denied the benefit for a reason infringing on his interest in freedom of speech. This Court is of the opinion that the members of the examining committee did not act arbitrarily or capriciously when they directed questions, if any, to the plaintiff regarding the "Exer-Genie". That questions asked regarding the "Exer-Genie", if any, were within the permissible realm of inquiry and did no violence to plaintiff's rights accorded him under the First Amendment of the Constitution of the United States.

■ 6. It further appears to the Court that the oral examination, here complained of by the plaintiff, was but one of four elements comprising the qualifying examination. The plaintiff was also found deficient in each of the three other elements, i. e., academic record, scholarly paper and written examination. As mentioned above, the parties have stipulated (in stipulation #28 attached to the Pretrial Order) that a shortcoming in respect to any one of the four elements evaluated is, in and of itself, a sufficient basis in fact for a reasonable Committee member to vote not to continue a candidate in the doctoral studies program. This position is further buttressed by the deposition of Dr. McCraw at page 86. Hence, there are separate, independent and significant grounds upon which to support the decision of the Committee not to permit plaintiff to continue in his doctoral studies program even if the inquiries, if any, at the oral examination concerning the "Exer-Genie" had never been made.

■ 7. Further, the Court is of the opinion that there is nothing but the uncorroborated testimony of the plaintiff to indicate that his promotion of the "Exer-Genie" had anything to do with the decision made by the Committee on Graduate Studies in his case. Indeed,

the greater weight and preponderance of the evidence, as reviewed above, shows that plaintiff's promotional activities played no role in the decision. On this point, plaintiff has failed to meet his burden of proof.

█ 8. Assuming, arguendo, that plaintiff's promotion of the "Exer-Genie" did play a part in the decision of the Committee, there is absolutely nothing in the record to sustain plaintiff's contention that his representations concerning the device imparted opinions of a scientific and educational nature in an area of public concern—physical health and fitness. To the contrary, the only evidence available indicates that plaintiff was engaged in the wholly commercial enterprise of advertising and selling the "Exer-Genie" for profit. The plaintiff's activities therefore fall squarely within the "commercial speech" doctrine of Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), thereby falling outside the protection of the First Amendment.